50 CCPA

**Ivar JEPSON, Appellant,**

v.

**Robert E. COLEMAN, Jr., and Calvin D. MacCracken, Appellees.**

**Patent Appeal No. 6919.**

United States Court of Customs and Patent Appeals.

March 13, 1963.

George R. Clark, Mason, Kolehmainen, Rathburn & Wyss, Walther E. Wyss, Chicago, Ill., for appellant.

G. Kendall Parmelee, Curtis, Morris & Safford, New York City, for appellees.

Before WORLEY, Chief Judge, and MARTIN, SMITH, and ALMOND, Judges.

MARTIN, Judge.

This appeal is from the decision of the Patent Office Board of Patent Interferences which awarded priority of invention to senior party Coleman et al. in Interference No. 88,406. That interference involves an application Serial No. 309,416 filed September 13, 1952 by the senior party, Coleman et al. and a patent 2,753,435, granted July 3, 1956, upon an application Serial No. 425,192 filed April 23, 1954 by the junior party, Jepson.

The interference involves five counts which correspond to claims 1 through 5 of Jepson's patent. Counts 1 and 2 read:

"1. A thermal blanket comprising two fabric members united by a plurality of spaced parallel stitchings thereby to define a plurality of parallel passageways between said fabric members, a pair of flexible headers extending along one end of said blanket and generally perpendicular to said passageways, a plurality of flexible tubes of U

shape, having the legs of the U disposed in said passageways and one leg of each U being connected to one of said headers, while the other leg of each U is connected to the other header, whereby all of said tubes are connected in parallel, and means for circulating a fluid medium through said headers and tubes.

"2. A thermal blanket comprising a fabric having a plurality of parallel passageways defined therein, a pair of flexible headers extending along one end of said blanket and generally perpendicular to said passageways, a plurality of flexible tubes of U shape, having the legs of each U disposed in said passageways and one leg of each U being connected to one of said headers, while the other leg of each U is connected to the other header, whereby all of said tubes are connected in parallel, means for circulating a fluid medium through said headers and tubes, and control means for controlling the temperature of said blanket."

Counts 3 and 5 correspond generally to count 1. However, count 3 further specifies that the means for circulating the fluid is connected to the headers at a point midway between the ends thereof and recites "control means for controlling the temperature of said blanket." Count 5 specifies that the means for controlling the temperature of the blanket is responsive to the temperature of the fluid in one of the headers. Count 4 corresponds to count 2 but also has the additional limitation that the means for controlling the temperature of the blanket is responsive to the temperature of the fluid in one of the headers.

The five counts are specific to a thermal blanket containing a plurality of small flexible U-shaped fluid carrying tubes in a plurality of parallel passageways located in the blanket. A pair of flexible headers extend along one end of said blanket and are generally perpendicular to said passageways. One leg of each U-shape tube is connected to one of said headers while the other leg is connected to the other header. In operation, warm liquid is circulated through the U-shaped tubes by means of the headers, one header acting as an inlet header and the other header serving as an outlet header for the circulating liquid.

The Coleman et al. application describes a thermal blanket one embodiment of which is shown in Figure 1 of the Coleman et al. application, set forth below:

This figure shows a thermal blanket 8 including a pair of fabric layers 10 and 11 sewed together along the outside edges and along spaced lines 13 to provide channels for holding flexible tubing. The parallel rows of stitchings 13 continue out closely adjacent to one end of the blanket for holding the bight of each U-shaped tube in position between the fabric layers. To provide a uniform temperature throughout the area of the blanket, tubes 12 are connected in parallel between inlet and outlet headers 16 and 18. The header units 16 and 18 are located midway of the blanket's end and are connected to the inlet and outlet tubes 26 and 28 for heat exchange fluid.

The Jepson patent shows and describes a thermal blanket as specified in the counts before us and as shown in Jepson's Figure 2 set forth below:

Appellees, Coleman et al., do not contend that the construction shown in their Figure 1 supports the counts. However, they contend that, when their Figure 1 is considered with other relevant portions of the specification, the application of Coleman et al. as filed clearly discloses an alternative way of constructing the blanket to provide uniform temperature across the blanket, which alternative way supports the counts. They take the position that, in this alternate construction, a pair of flexible header tubes of large diameter are substituted for the small headers 16 and 18 and for the connecting portions of the various U-shaped tubing circuits which extend along the edge of the blanket to the compact headers or junction units 16 and 18.

The board found that appellees did have the right to make counts 1–5. It held that appellee's Figure 1, when considered with the paragraph beginning at page 5, lines 9 et seq. of appellees' ap-

plication establishes that appellees disclose two ways of making the blanket. That paragraph is as follows:

"It has been found preferable to use small diameter tubing throughout the entire blanket and to connect this tubing to small compact headers or junction units 16, 18 rather than having large diameter header tubes extend along the edge of the blanket. The reason for this is that if long header tubes are used, they must be large enough in diameter to carry the liquid for substantially all of the circuits 12 without appreciable pressure drop. On the other hand, tubing of the required diameter is very likely to kink and materially reduce or even completely cut off the flow of liquid if made flexible enough to conform to folds and the like in the blanket. The header units 16, 18 can be very compact assemblies, fully rigid to obviate kinking and yet extending over no more than one or two square inches of blanket surface area."

Priority of invention was accordingly awarded to appellees.

Appellant, in urging reversal of the board's decision, contends that the above paragraph in the Coleman et al. application, which appellant alleges as the "critical paragraph," is only a criticism of prior art structures. He further contends that the five counts involved in the interference are limited to features not mentioned in the "critical paragraph."

We are faced with one issue here. Appellees stated it very concisely in their brief wherein they said:

"The only question raised in this forum is the correctness of the Board of Patent Interferences decision that senior party Coleman and Mac-Cracken is entitled to make the claims which are the Counts of the Interference."

█ When one copies claims from a patent for the purpose of instituting interference proceedings, in order to be successful, that person's application must clearly support those counts. See Brand v. Thomas, 96 F.2d 301; 25 CCPA 1053; Crome v. Morrogh, 239 F.2d 390, 44 CCPA 704. There must be no doubt that an applicant discloses each and every limitation of the claims and all doubts must be resolved against the copier. See Segall v. Sims et al., 276 F.2d 661, 47 CCPA 886. It is not a question whether one skilled in the art *might* be able to construct the patentee's device from the teachings of the disclosure of the application. Rather, it is a question whether the application necessarily discloses that particular device. See Crome v. Morrogh, supra.

Here appellant's device as claimed has certain limitations which must be found in the disclosure of appellees' application if appellees are to prevail. That disclosure must teach that the blanket, among other features, has (1) a plurality of passageways; (2) a pair of flexible headers; (3) the headers in (2) extending along one end of the blanket and being generally perpendicular to the passageways in (1); (4) a plurality of flexible tubes of U-shape; (5) legs of the U disposed in the plurality of passageways; (6) one leg of the U connected to one of said flexible headers; (7) the other leg of the U connected to the other flexible header; (8) all tubes connected in parallel.

Unquestionably appellees in their specification accurately and concisely disclose each and every feature of their preferred embodiment and in the so-called "critical paragraph" herein quoted, they negatively disclose a different blanket than described as their preferred embodiment. That different blanket *may or may not* have all the features of appellant's device. Certainly it could, but is that sufficient to satisfy the law on this subject? We think not.

Appellees bring our attention to many other parts of their specification as being significant but they fail to point to any specific language which directly supports the counts in issue other than the "critical paragraph." It is true that immediately prior to that paragraph they

describe in great detail the embodiment represented by their Figure 1 but in the "critical paragraph" they affirmatively teach nothing. Even if we were to agree, merely arguendo, that that paragraph in its negative way teaches an embodiment like appellant's device, that would not come within the principles that we have heretofore set forth governing a situation such as this one. Appellees want us to assume that one skilled in this art with the teachings of their other embodiment and the language of the "critical paragraph" before him would *necessarily* construct appellant's blanket. We cannot agree with their position.

Let us analyze this "critical paragraph" a bit more closely. Appellees say "It has been found preferable to use small diameter tubing * * * and to connect this tubing to small compact headers or junction units 16, 18 rather than having large diameter header tubes extend along the edge of the blanket. * * * " What edge? Appellees say it must be the same edge where 16 and 18 are positioned. If so, why did not appellees tie it down to that edge rather than use language which does not preclude the headers being disposed along an edge parallel to the tubes 26 and 28 from their pump? Where is the clear language teaching that the headers are perpendicular to the passageways; that one leg of the U is connected to one of said headers and the other leg to the other header in the same manner as described and shown in appellant's Figure 2; and that all tubes are connected in parallel. Where is the clear language in appellees' application that teaches those features? We cannot find it.

Certainly appellees would not say that they teach the blanket of the counts in the same clear language that they teach their preferred embodiment. None of the figures of appellees' application nor any of the claims ever presented in their application teach an embodiment that even distantly resembles appellant's embodiment.

■■ We believe that the board erred in concluding that appellees taught the

structure recited in the counts on the basis of appellees' Figure 1 when considered with the negatively couched "critical paragraph." In our opinion the board reached its conclusion on the basis of speculation rather than by applying the proper rule that, in order for appellees to prevail, their teachings of appellant's device as claimed in the counts in issue must clearly cover each limitation of the counts.

Appellees argue strenuously that since their application emphasizes the necessity for uniform heating across the entire blanket, this factor indicates that their application teaches appellant's embodiment. Appellees refer in particular to the portion of their specification which reads:

"Furthermore, instead of the six tubing circuits shown in the drawing, twenty or more such circuits may be used to distribute the heat more uniformly.

"The loops of tubing 12 are connected between a pair of header units 16, 18, one of which (16) constitutes an input header and the other of which (18) constitutes a return header. The arrangement is such that heated liquid will enter the blanket through the input header 16, flow through the various loops of tubing 12 in parallel, and flow out through the header 18. This parallel flow arrangement has the advantage that it equalizes the heating effect across the blanket, and also reduces the pressure drop or resistance to liquid flow in the tubing 12, as compared with a series path through a single tube looped back and forth across the entire blanket."

That portion refers to appellees' Figure 1. Since appellees thus obtain the uniform temperature discussed in their Figure 1 construction which is their admittedly preferred embodiment and which does not fall within the terms of the counts, we are unable to see how appellees' teaching with respect to uniform temperature constitutes an indication that their preferred construction

**538**

should be modified to provide the particular construction of the counts.

Appellant has argued before us that appellees further fail to disclose the limitation in count 3 of "means connected to said headers at a point midway between the ends thereof for circulating a fluid medium between the headers and tubes." That argument was denied consideration on the merits by the board because it was not raised in the motion to dissolve which appellant filed. This action by the board requires no review by us in view of our finding with respect to other limitations in the counts.

We do not believe that appellees have fulfilled the requirements of the law in the premises; therefore we *reverse* the decision of the board.

Reversed.

RICH, J., did not sit or participate in decision.

Worley, Chief Judge, dissented in part.