REX CHAINBELT INC., Plaintiff-
Appellee,

v.

BORG–WARNER CORPORATION,
Defendant-Appellant.

REX CHAINBELT INC., Plaintiff-
Appellee,

v.

CARMAN INDUSTRIES, INC.,
Defendant-Appellant.

Nos. 71–1596, 71–1597.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 28, 1972.

Decided April 26, 1973.

Rehearing Denied May 18, 1973.

Thomas F. McWilliams, Malcolm S. Bradway, Chicago, Ill., Basil H. Lorch, Jr., New Albany, Ind., for defendants-appellants.

Albert H. Pendleton, Ralph E. Church, Jr., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and CUMMINGS, Circuit Judge.

HASTINGS, Senior Circuit Judge.

On October 5, 1965, George D. Dumbaugh filed a patent application, Serial No. 493,197. Patent No. 3,251,457 issued to him on May 17, 1966.[1] The Dumbaugh patent has been described as being generally directed to "the varying of the feed rates of vibratory conveyors by varying the voltage applied to a squirrel cage type of motor which drives the feeder or conveyor."[2] Alvin G. Westerman applied for a patent on October 26, 1965. His application bears Serial No. 505,284.[3] Pursuant to 35 U.S.C.A. § 135, the Commissioner of Patents determined that the Westerman application interfered with the Dumbaugh patent and, on November 21, 1966, gave the requisite notice to the parties.

■ Pursuant to Rule 205(a) of the Rules of Practice in Patent Cases, 37 C.F.R. § 1.205(a) (1972), Title 35, U.S.C.A., Westerman, the applicant party, amended his application by copying verbatim the eight apparatus and four method claims of Dumbaugh, the patentee party, and adding them to his own application. The copied claims were designated as the counts of Interference No. 95,710,[4] which was referred to the Board of Patent Interferences (Board) for resolution. The Board is the tribunal within the Patent Office charged by Congress with the exclusive responsibility for determining "the question of priority of invention." 35 U.S.C.A. § 135. Because Dumbaugh's application had been filed prior to Westerman's, Dumbaugh was the senior party before the Board. In the interference proceedings, therefore, it was incumbent on Westerman, as the junior party, to prove his priority of invention by a preponderance of the evidence. Sanford v. Kepner, 3 Cir., 195 F.2d 387, 389 (1952), aff'd, 344 U.S. 13, 73 S.Ct. 75, 97 L.Ed.12. The Board's decision of April 30, 1970, awarded priority to Dumbaugh.

Plaintiff then brought the instant action in the district court under 35 U.S.C.A. § 146 to review the Board's award. The court on April 20, 1971,[5] upon the record made before the Board and a small amount of additional testimony adduced by plaintiff in the district court, set aside all the Board's findings and awarded priority of invention to Westerman. We reverse the judgment of the district court.

### I.

■■ We are faced with the threshold question of whether the district court applied the correct standard of re-

1. Defendant Carman Industries, Inc. (formerly Carrier Manufacturing Company), Dumbaugh's employer, was the initial assignee of this patent. In 1968 it sold the patent to a company whose assets have since been acquired by defendant Borg-Warner Corporation. Carman retains a license under the patent and, therefore, has an interest in the outcome of these proceedings.

2. Carrier Mfg. Co. v. Rex Chainbelt, Inc., E.D.Wis., 281 F.Supp. 717, 718 (1968). The description appears in the report of a decision concerning pretrial discovery in an infringement suit brought by present defendant Carman (under its former name) against present plaintiff. That suit was later dismissed as a part of a settlement agreement between the parties thereto under which each side granted the other a license for the invention in issue. The questions of who is the licensor under the agreement and who is the licensee were left to abide the ultimate determination of priority of invention in these interference proceedings.

3. Plaintiff Rex Chainbelt Inc., Westerman's employer, is the assignee of his patent application.

4. The interference as so declared contained twelve counts. The parties have agreed that Count 5 is representative:

"In an electric motor drive for a vibratory free mass system, the combination of a mass mounted for a vibratory movement, means for exciting the mass to a vibratory movement with a given frequency and stroke, said means including an A.C. squirrel cage motor carrying an eccentric weight, and means for simultaneously varying both said stroke and said frequency, said last named means including means for varying voltage applied to said motor."

5. The district court's unreported amended opinion was filed May 5, 1971.

view. An action under § 146 is of a hybrid nature. It has one element of a trial de novo in that either party is permitted to introduce evidence which was not before the Board.[6] Nevertheless, it is clear under the controlling case of Morgan v. Daniels, 153 U.S. 120, 14 S. Ct. 772, 38 L.Ed. 657 (1894), that a § 146 action is essentially of an appellate character and that the scope of review is quite narrow:

"Upon principle and authority, therefore, it must be laid down as a rule that, where the question decided in the patent office is one between contesting parties as to priority of invention, the decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, *unless the contrary is established by testimony which in character and amount carries thorough conviction.*" *Id.* at 125, 14 S.Ct. at 773 (emphasis added).

In 1916, Circuit Judge Mack, speaking for our court in Gold v. Gold, 7 Cir., 237 F. 84, set forth a standard of review for district courts to follow in these cases which, with only the modifications made necessary by intervening amendments to the statute,[7] has continuing vitality:

"The final decision in the interference proceedings, while not conclusive, is nevertheless of the utmost importance. The Court of Appeals [of the District of Columbia] acts therein as the highest patent tribunal; like the Patent Office officials, its members acquire a wide experience in these intricate questions, the solution of which demands expert knowledge and training. Moreover, unlike the ex parte grant of patents, interference proceedings are contested between parties in interest, and, while conducted by administrative officials, are quasi judicial in their nature.

"The District Court, in this statutory proceeding to review the decree rendered in a contested case by a court acting as the final expert administrative governmental department, exercises a jurisdiction somewhat analogous to, though broader than, that exercised by a court of equity on a bill to set aside a judgment at law—broader, in that the evidence may go to the merits of the original controversy; but, though a re-examination of the evidence is not precluded, the court must be thoroughly convinced that it furnishes no substantial support whatever for the decree before the conclusions reached by the Court of Appeals of the District of Columbia will be overturned.

"And while this seems obvious enough, when the re-examination involves merely a weighing of the evidence and a consideration of the credi-

6. "In such suits the record in the Patent Office shall be admitted on motion of either party upon the terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court imposes, without prejudice to the right of the parties to take further testimony." 35 U.S.C.A. § 146.

7. The statutory basis for interference proceedings and district court review of the Patent Office determination of priority is now found in 35 U.S.C.A. §§ 135 & 146. Within the Patent Office, the Board of Patent Interferences is the only body which determines interferences, so that its decision is final. If the dissatisfied party wishes to obtain district court review of the Board's award, he may bring his action immediately after the award is made, as was done in the instant case.

*The relevant statutes in effect in 1916* were Rev.Stats. §§ 4904, 4909–4910 & 4915 (Act of July 8, 1870, ch. 230, §§ 42, 46–47 & 52, 16 Stat. 204–205) and Act of Feb. 9, 1893, ch. 74, § 9, 27 Stat. 436. The initial determination of priority was made by the Primary Examiner. Within the Patent Office, his decision was reviewable by the Board of Examiners-in-Chief, and their decision could be appealed to the Commissioner of Patents in person. His decision could be appealed to the Court of Appeals of the District of Columbia, and if this step was taken, the court's decree stood as the final determination of the Patent Office. At the option of the dissatisfied party, a bill in equity to review the Patent Office decision could be brought in the district court either after the Commissioner's ruling or after that of the D.C. Court of Appeals.

bility of witnesses, as in the ordinary priority of invention cases, it is equally true when questions peculiar to the patent law, such as the construction and scope of the patent application, are involved. For it is just such questions that the administrative tribunal is pre-eminently qualified to solve. Even then, of course, the court is not absolved from the duty of examination; but, unless it be perfectly clear that the final expert administrative body, the Court of Appeals, erred, relief should not be granted * * * ." *Id.* at 86.

It is plain from the district court's memorandum opinion of May 5, 1971, that it did not apply the proper criterion. After finding that it had jurisdiction over the parties and of the subject matter of the action, the court said: "The plaintiff has maintained its burden of proof of the essential elements and alleged facts of the complaint by a preponderance of the evidence * * * ." We find no basis for accepting plaintiff's contention that the district court meant this statement to apply only to the ten "formal" paragraphs of the complaint, but not to the eleventh paragraph which alleged that the Board's award had been erroneous. The district court's decision cannot stand, therefore, unless as we apply the "thorough conviction" test laid down in Morgan v. Daniels, it appears to us that the district court reached the correct result despite its use of the wrong standard.

## II.

■■ It has long been accepted that the question of priority of invention is the only matter within the competence of the Board of Patent Interferences. *See* Ferree v. Shephard, 384 F.2d 1019, 55 C.C.P.A. 848 (1967). This restriction of the Board's jurisdiction does not, how-

ever, prevent it from determining certain matters "ancillary"[8] to the basic question of priority. The Board's decision on the ancillary question of Westerman's right to make the counts of the interference was one of the independent grounds for its award. Dumbaugh raised the question initially during the usual motion period by moving to dissolve the interference.[9] The Primary Examiner denied Dumbaugh's motion, holding that Westerman's disclosure "comprehends within its confines the AC squirrel cage motor." In so doing, however, the Primary Examiner applied the wrong rule of law. As the Board correctly pointed out in its opinion, "a sufficient basis [to support the copied claims] is provided *only* if the specification is so worded that the necessary and only reasonable construction to be given the disclosure by one skilled in the art is one which will lend clear support to the claim" (emphasis in original). The question is not whether the applicant party's application can be read to include the particular device of the patent, but whether it necessarily discloses the device. Gubelmann v. Gang, C.C.P.A., 408 F.2d 758, 766 (1969); Dreyfus v. Sternau, 357 F.2d 411, 415, 53 C.C.P.A. 1050 (1966); Jepson v. Coleman, 314 F. 2d 533, 536, 50 C.C.P.A. 1051 (1963); Crome v. Morrogh, 239 F.2d 390, 392, 44 C.C.P.A. 704 (1956).

■ Measuring the Westerman application by this criterion, the Board concluded that it failed to disclose as a necessary element the use of an A.C. squirrel cage induction motor. Rather, the Board found that the application might also be read to teach the use of a wound rotor motor—the other type of A.C. induction motor. Plaintiff expended most of its energies before the district court attempting to refute the Board's conclusion by evidence of the character and

---

8. "An *ancillary* question has been defined as one which, if decided in favor of the moving party, would necessarily result in judgment against his adversary, that is, that the moving party would be adjudged to be the prior inventor of the interfer-

ence issue." Baker, Outline of Patent Office Interference Practice 43 (12th rev. ed. 1965) (emphasis in original).

9. *See* Rule 231, Rules of Practice, 37 C.F.R. § 1.231 (1972), Title 35, U.S.C.A.

amount required by Morgan v. Daniels. Thus, it sought to demonstrate by the testimony of experts that the phrase "ordinary induction motor," which appeared in the Westerman application, would be read by one skilled in the art to signify a squirrel cage motor to the exclusion of any other type. Furthermore, plaintiff contended and attempted to prove that the symbol employed in the drawings accompanying the Westerman application disclosed a squirrel cage motor to the exclusion of any other type.

With respect to the meaning of "ordinary induction motor," plaintiff's expert witnesses asserted that squirrel cage motors are ordinary in the sense that they are the induction motors most usually encountered by manufacturers who employ induction motors in the course of their business. Defendants' experts testified that wound rotor motors are also ordinary in the sense that they are common, simple and relatively uncomplicated. On cross-examination, neither side's witnesses were willing to state that the *opposing witnesses* were wrong in their testimony. The conclusion to be drawn from this testimony comports with the result reached by the Board, namely, that the phrase "ordinary induction motor" does not necessarily reveal a squirrel cage motor.

■ However, the testimony with respect to the symbol used in the drawings cuts the other way. As the Board pointed out in its opinion, "drawings alone may be sufficient to support a count—if there are no contradictory disclosures in the specification and the drawings are unambiguous." [10] The additional testimony before the district court, which was not, of course, available for the Board to consider, establishes clearly and with sufficient force to compel "thorough conviction" that the symbol used in the Westerman application would teach the exclusive use of a squir-

rel cage motor to one skilled in the art. The new evidence before the district court was uncontradicted that the symbol used in the Westerman application was the one approved by the American Standards Association for depicting an A.C. squirrel cage induction motor. Although the Association approved the same symbol to represent other elements in an electrical system (a generator, a repulsion motor or a rotary phase converter, for example), from the drawing as a whole it would be obvious to one skilled in the art that the symbol was meant to represent a motor driving a load. Aided by the language of the specification in Westerman's application, then, the symbol would necessarily disclose a squirrel cage rather than a wound rotor motor. The Board erred in finding otherwise, and the district court was correct in overruling this finding. However, finding that Westerman had the right to make the counts merely gives plaintiff the right to go forward before the Board and does not reach the ultimate question of priority of invention. We next consider the important central question of priority.

### III.

■ In conducting our review of the district court's action in these interference proceedings, we have attached paramount significance to the roles to be played by the Board and the district court in the factfinding process. The record shows that plaintiff's evidence before the district court touched mainly on the question of Westerman's right to make the interference counts. What little evidence plaintiff introduced relative to actual priority of invention was largely cumulative of that before the Board. Plaintiff's failure to present "new" evidence before the district court on this issue did not of itself require the district court to uphold the Board's award.[11]

10. Quoting (in part) Johnson v. Riener, 302 F.2d 757, 761, 49 C.C.P.A. 1096 (1962).

11. In fact, we note that the Court of Appeals for the District of Columbia Circuit recently approved an award reversal

Nevertheless, consistent with the "thorough conviction" test enunciated in Morgan v. Daniels, we think that the less "new" evidence there is before the district court, the more blatant the Board's factual errors must have been before the district court is justified in reversing the Board's award.

It requires no citation of authority to state that invention has not occurred until the subject of the invention has been both conceived and reduced to practice. In the absence of convincing proof of earlier dates, the date of application for a patent is presumed to be the date of constructive conception and reduction. It is for this reason that the earlier applicant is considered the senior party in an interference, for until proof is taken, he is the first inventor by benefit of this presumption. If the parties to an interference are not content to rely on their application dates (and the junior party cannot rely on his if he is to prevail), they have the opportunity during the interference proceedings to establish earlier dates by clear proof. The primary date to establish is that of conception, since 35 U.S.C.A. § 102(g) permits the party with the earlier conception date to prevail if he can show "reasonable diligence" in later reducing the invention to practice. In the present proceedings it is uncontested that Dumbaugh conceived the invention on July 8, 1965, and reduced it to practice on July 27, 1965. The question of priority of invention turns, then, on plaintiff's proof that Westerman conceived the invention at some particular date prior to July 8, 1965. Specifically, under the facts of this case, plaintiff must demonstrate convincingly that Westerman conceived the invention now in issue in late 1959 and early 1960 in the course of correcting a feeder malfunction at a customer's plant and of performing certain experiments incidental thereto.[12]

---

based entirely on the record made before the Board. Cody v. Aktiebolaget Flymo, 452 F.2d 1274, 1279–1280 (1971), cert. denied, 405 U.S. 990, 92 S.Ct. 1254, 31 L.Ed.2d 456 (1972).

12. Plaintiff has introduced substantial evidence concerning the activities between 1960 and 1965 of some of its employees other than Westerman. Its purpose in so doing was to prove other reductions to practice before Dumbaugh's in the event the Board did not think Westerman's 1959–1960 activities established a reduction to practice. The theory under which they sought to have these activities credited to Westerman has its basis in a principle of patent law first laid down in Agawam Co. v. Jordan, 74 U.S. (7 Wall.) 583, 19 L.Ed. 177 (1869):

"No one is entitled to a patent for that which he did not invent unless he can show a legal title to the same from the inventor or by operation of law; but where a person has discovered an improved principle in a machine, manufacture, or composition of matter, and employs other persons to assist him in carrying out that principle, and they, in the course of experiments arising from that employment, make valuable discoveries ancillary to the plan and preconceived design of the employer, such suggested improvements are in general to be regarded as the property of the party who discovered the original improved principle, and may be embodied in his patent as a part of his invention." Id. at 602.

See also Milwaukee v. Activated Sludge, Inc., 7 Cir., 69 F.2d 577, 587 (1934), cert. denied, 293 U.S. 576, 55 S.Ct. 87, 79 L.Ed. 673.

The theory seems to be that in the same way that an employee's work is creditable to his inventor-employer under the conditions set out above, a fellow-employee's work is creditable to his inventor-fellow-employee, at least when both employees are under obligation to assign to their common employer the rights in any discovery made in the course of their employment. Under the view we take of this case, we do not find it necessary to decide this issue.

It is beyond dispute that if plaintiff is to prevail, it must prove at least that Westerman *conceived* the invention in the technical sense in which that word is used in patent law. It is clear to us that unless Westerman conceived the invention, he is not the inventor, is not entitled to a patent under 35 U.S.C.A. § 102(f) and cannot be awarded priority of invention in these proceedings. Moreover, if proof that Westerman conceived the invention is to be found anywhere, it must be found in the evidence

In 1959, plaintiff's predecessor, Carrier Conveyor Corporation [13] (Conveyor), of Louisville, Kentucky, designed and marketed several different types of vibratory feeders, including its Amplitrol model. The Amplitrol feeder embodied a free mass, natural frequency vibratory system of a type well known to the art. The three main components of this system were the exciter mass (an A.C. squirrel cage induction motor with an eccentric weight mounted on each end of its shaft), the feeder mass (a trough containing a load of particulate matter) and a set of pneumatic springs (bags of compressed air) connecting the two masses. The squirrel cage motor was chosen for use because of its durability and its minimal maintenance requirements. The speed of this motor, when not driving a load or when driving a small load relative to its size, was known to be adjustable by controlling the voltage applied to it. But it was thought in the art that, because of load torque requirements and the limited thermal capability of a squirrel cage motor, motor speed could not be adjusted within the context of a vibratory system without burning out the motor. As a practical matter, the fact that motor speed could not be adjusted meant that the commercially critical step of controlling the feed rate off the end of the trough could only be accomplished by varying the stiffness of the springs. This accounted for the presence in the Amplitrol feeder of pneumatic springs, rather than helical steel coils or other common type of spring. The stiffness of the springs, and hence the feed rate, of the Amplitrol feeder was controlled by increasing or decreasing the compressed air pressure in the pneumatic springs.

In August 1959, Conveyor sold two Amplitrol feeders to the American Tobacco Company (American Tobacco) for use in its Richmond, Virginia, plant. The squirrel cage motors in the feeders sold to American Tobacco had internal wiring connections that could be connected in such a way that the machine could operate on either 220 volts or 440 volts of electrical potential. Before being shipped to American Tobacco, the feeders had been tested at Conveyor's plant, which had a 440-volt source in the testing area. Since American Tobacco's order specified that the feeders should be wired for 220 volts, the necessary adjustments to the internal connections should have been made before the feeders left the Conveyor plant. Evidently only one of the feeders was properly wired. In late October 1959, soon after the feeders had been installed at American Tobacco, Conveyor received a complaint that one of the new feeders would not convey material properly.

The complaint came to Westerman, who was in charge of customer service for Conveyor, and he spoke by telephone to an engineer at American Tobacco. Westerman first suggested some minor adjustments to the malfunctioning feeder. While these suggestions were being followed up, he studied Conveyor's file on the American Tobacco order and noticed the 220-volt specification. Westerman later testified: "In trying to solve the problem, the thought came to me that possibly one feeder has been

concerning his 1959–1960 activities, for his deposition testimony before the Board was straightforward and unequivocal that he had nothing further to do with the project or any continuation of it or with anything involving "variable speed controls for feeder motors" after that time. Thus, there is no need to consider the 1960–1965 activities of plaintiff's other employees for any purpose relevant to the present proceedings.

13. At about this time, plaintiff was in the process of acquiring Carrier Conveyor Corporation, which after acquisition continued to operate as plaintiff's Carrier Division under the same management. Sometime thereafter, Robert M. Carrier, Jr., the president of the acquired company and general manager of the Carrier Division, left plaintiff's employ to organize Carrier Manufacturing Company. By a change of corporate name, this latter company became defendant Carman. See note 1, *supra.*

changed to 220 volt and the other feeder had not." At this point he hypothesized that if the lower than designed voltage had decreased the speed of the squirrel cage motor, the normal and desirable feed rate could be obtained by making an abnormally large adjustment to the air pressure in the springs. When the American Tobacco engineer called back, Westerman told him to lower the air pressure substantially. After this adjustment had been made (from approximately 30 p.s. i. to approximately 15 p. s. i.), the recalcitrant feeder operated at a satisfactory feed rate for two months until Westerman could travel to Richmond, verify the wiring error and have the internal wiring connections changed to 220 volts.

Early in November 1959, Westerman reported the American Tobacco incident to John M. Morris, his superior. Morris told Westerman that he must have been wrong about the miswiring for if Westerman's theory of a miswiring were correct, the malfunctioning feeder's motor would have burned out within a few hours of its installation and first use by American Tobacco. The other engineers at Conveyor who were consulted on the matter agreed with Morris' analysis. Westerman, convinced of the correctness of his own thinking, prevailed upon Morris to perform an experiment with an Amplitrol feeder in Conveyor's laboratory, in an attempt to recreate what Westerman thought had occurred with the American Tobacco feeder.

At the laboratory, Westerman and Morris found the feeder wired for 220 volts, because the laboratory's available source was 220 volts. The feeder was started, a small bag of sand was put in the trough to act as the load, and the air pressure in the pneumatic springs was adjusted to the point where feed rate was normal. The feeder was then turned off, the internal wiring connections were changed to 440 volts and the feeder was restarted. Feed rate was negligible, but the motor did not heat up. Air pressure in the pneumatic springs was then decreased substantial-

ly, and the feeder again began to operate at normal feed rate. It was allowed to continue running in this way for a week or two; Westerman, Morris and the other engineers at Conveyor looked at it occasionally as they passed through the laboratory. At no time did the squirrel cage motor show signs of overheating.

As stated above, Westerman traveled to Richmond in early January 1960, bringing the American Tobacco incident to a close. In his deposition testimony before the Board, Westerman was asked the following questions and made the following responses:

"Q258 Now, after this laboratory experiment was concluded, did you have anything further to do with that particular project or a continuation of the project?

"A Of the project, no, sir.

"Q259 Did you ever have anything further to do with variable speed controls for feeder motors after that time?

"A No, sir.

"Q260 Now, I believe you stated on direct that you told Mr. Morris that you thought this particular setup could be patentable. Do you recall what Mr. Morris said to you in response?

"A His response to me after we had run the test in the lab was that the research and development, of which he had control, would pursue the incident that we just witnessed in the lab.

\* \* \* \* \* \*

"Q263 When you told Mr. Morris you thought this should be patentable, just what did you have in mind as the patentable subject matter?

"A Varying the speed of the motor and changing the rate of feed on a work member.

"Q264 Did you have in mind any particular means of doing that?

"A No, sir.

"Q265 At the time of this laboratory experiment, did you know of anything else with respect to speed variation other than this one incident of of [sic] running the 440 volt motor on the 220 volt line?

"A No, sir.

"Q266 Wouldn't it be correct to categorize the situation at American Tobacco Company as an unsatisfactory situation, having the 440 volt motor on the 220 volt line, which you subsequently corrected by rewiring the motor for 220 volts?

\*    \*    \*    \*    \*    \*

"A Yes, sir.

"Q267 Wouldn't it be correct to say that that situation was accidental?

"A It was accidental.

"Q268 The effects were undesirable?

"A From the customer standpoint, yes, and from our standpoint of leaving it like that, yes."

We now turn to a consideration of the American Tobacco incident.

## IV.

The Board was quite unimpressed with the American Tobacco incident as proof of conception of the invention by Westerman. It stated:

"We regard such evidence at best as only providing proof of the basis, or of the impetus, for Westerman's idea or appreciation that the motor speed was dependent on the effect of the applied voltage and that the motor, when used with a vibratory feeder, would not burn out when energized at lower than the designed voltage. We do not regard this as establishing even complete conception of the invention in issue by Westerman."

The district court disagreed with the Board on this point, finding in the American Tobacco incident not only an "idea or appreciation," but conception and reduction to practice of the precise invention in issue. It appears to us that the disagreement between the Board and the district court stems from their different approaches to the incident, particularly in two aspects. First, the district court gave full credit to Westerman's testimony that as soon as he discovered that the motor in an Amplitrol feeder would not burn up when energized at lower then the designed voltage, he realized that feed rate could be varied by electrical controls alone and that the use of compressed air, a costly second form of energy, could be obviated. Secondly, having credited this testimony completely, the district court thought that Westerman's professed "realization" constituted conception of the invention in issue. The Board, either expressly or impliedly, took the opposite position on each matter.

As far as the physical facts of the American Tobacco incident are concerned—the miswiring of the motor, the telephoned complaint, the trip to Richmond and the like—there is no serious reason to doubt that they occurred. Contemporaneous documentation, from Conveyor's files and elsewhere, attests to their occurrence. The same cannot be said for Westerman's "realization" of the essential principle of the invention. As Westerman admitted in his deposition testimony, there were no documents known to exist, either in his possession or plaintiff's, showing that between October 1, 1959, and February 15, 1960, he personally had the idea that it was either desirable or possible to vary feed rate by varying voltage to the motor. Morris testified that there was no documentation anywhere, to his knowledge, dating from before August 2, 1965, which mentioned the American Tobacco incident or tied Westerman in any way to plaintiff's ongoing attempt to develop just such an electrical feeder control as Westerman claims he conceived in 1959–1960. Nor did any disinterested person testify to having heard Westerman, Morris or any of their colleagues discuss the American Tobacco incident or the "realization" that Westerman allegedly had. The only testimony favorable to Westerman on

this point was his own and that of certain of his co-workers, similarly concerned about the outcome of the interference proceedings, who tended to corroborate Westerman in their deposition testimony before the Board. Nothing further was added by the testimony before the district court. With the record in this state, we cannot fault the Board for finding, as it must have done, that this self-serving oral testimony was inherently unworthy of credit. In order to have come to such a conclusion, it was not necessary for the Board to decide that Westerman and his witnesses were consciously doing otherwise than telling the truth as they remembered it. On the contrary, there is no hint of perjury in the record before us. The courts have long followed a rule, in patent cases where one party (particularly a non-patentee) must prove what he thought or did years before testimony is taken, of putting that party to the strictest of proofs. The soundness of such a rule is clearly demonstrated in this case where testimony was not taken until more than eight years after the events in question occurred. As the Supreme Court noted in The Barbed Wire Patent Case, 143 U. S. 275, 284–285, 36 L.Ed. 154 (1892):

> "The very fact, which courts as well as the public have not failed to recognize, that almost every important patent, from the cotton gin of Whitney to the one under consideration, has been attacked by the testimony of witnesses who imagined they had made similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence and to demand that it be subjected to the closest scrutiny."

*See also* Globe-Union, Inc. v. Chicago Telephone Supply Co., 7 Cir., 103 F.2d 722, 729–730 (1939); 1 Walker, Walker on Patents § 75, at 348, 351, 353 & 356 (Deller 2d ed. 1964).

As a final observation on this point, we note that quite aside from the rules laid down in The Barbed Wire Patent Case and Morgan v. Daniels, the result we reach is compelled by our own reading and consideration of the evidence. As this court said in Globe-Union, Inc. v. Chicago Telephone Supply Co., 103 F.2d 722, 732 (1939): "In the instant case the bulk of the record stands on deposition evidence. Findings of the trial court in such situations, while worthy of great consideration, are not conclusive in this court." *See also* Uihlein v. General Electric Co., 7 Cir., 47 F.2d 997, 1003 (1931).

Finally, the disagreement between the Board and the district court as to whether Westerman's "realization," if credited, would amount to conception of the invention in issue is most easily resolved by looking to the meaning of "conception of invention."

> "The conception of the invention consists in the complete performance of the mental part of the inventive act. All that remains to be accomplished in order to perfect the act or instrument belongs to the department of construction, not invention. It is, therefore, the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice that constitutes an available conception within the meaning of the patent law." Mergenthaler v. Scudder, D.C.Cir., 11 App. D.C. 264 (1897), quoted in 1 Walker, Walker on Patents § 75, at 356 (Deller 2d ed. 1964).

Deller's edition of *Walker on Patents* summarizes the law on this question even more succinctly by noting that "[a] mere idea is not conception" and that "[u]ntil the entire conception is complete and is ready to be incorporated in a practical embodiment, there is no available and complete conception of the invention within the meaning of the patent law." *Id.* at 357. *See* Standard Cartridge Co. v. Peters Cartridge Co., 6 Cir., 77 F. 630, 645 (1896).

When an alleged inventor has only an "idea or appreciation" of what he wants to accomplish and not a conception of the means to be used in ac-

complishing the purpose, particularly when the means constitute an essential part of the invention, the idea or appreciation cannot stand as a complete conception of the invention within the meaning of the law. Land v. Dreyer, C. C.P.A., 155 F.2d 383, 387, 33 C.C.P.A. 1108 (1946); *cf.* Reed v. Cutter, 20 F. Cas. 435, 438 (No. 11,645) (C.C.D.Mass. 1841) (Story, Circuit Justice). It is obvious to us, as it must have been to the Board, that Westerman had no conception of the means to be utilized in accomplishing feed rate variation. In addition to the previously quoted excerpt from Westerman's deposition testimony, the following passage from the same source is eloquent in establishing that Westerman did not conceive the invention in issue:

"Q167 You spoke earlier about electrical means, I am trying to quote you accurately, to control the speed of the feeder and therefore the feed rate, as being the idea that you had at the time of the laboratory demonstration.

"Can you state what it was you proposed to do electrically to effect that control?

"A Well, I could see where the change in the motor speed would change the feed rate, and with Morris being head of Research and Development, an electrical engineer from Speed School, I left that in his hands, because I didn't know what would be proper or the best way of controlling the speed of the motor.

"I just wouldn't know that, and I suggested or stated to him that he is versed in that subject and he ought to be able to work it out.

"Q168 Now, by that, do you have reference to specific varying voltage means?

"A I have reference to varying the voltage of the motor which we did to change the motor speed.

"Q169 But you did not suggest the specific means to be used for the purpose?

"A No, sir, I did not."

## V.

After having determined that Dumbaugh had priority of invention, the Board found and held as an alternative ground that the forfeiture doctrine of Mason v. Hepburn, D.C.Cir., 13 App.D.C. 86 (1898), applied to this case. The district court held to the contrary. We do not find it necessary to reach and determine this issue here.

Dumbaugh established conception and reduction dates in July 1965. Westerman did not succeed in establishing a conception date prior to his constructive conception date of October 26, 1965. It follows, then, that Dumbaugh has established priority of invention, and the award of priority by the Board of Patent Interferences to Dumbaugh was proper. Accordingly, the judgment of the district court is reversed, and this cause is remanded with directions to dismiss the amended complaint and enter judgment for the defendants.

Reversed and remanded.