ROGER LEE HEATH, Plaintiff-Appellant, v. ELIAS R. ZENKICH *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—88—478

Opinion filed March 20, 1989.—Rehearing denied July 17, 1989.

Gomer W. Walters and Joseph A. Grear, both of Haight & Hofeldt, of Chicago, for appellant.

Richard S. Phillips and John S. Mortimer, both of Wood, Dalton, Phillips, Mason & Rowe, of Chicago, for appellees.

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff, Roger Lee Heath, appeals the judgment of the trial court which held that the benefits of the inventorship of the BI-PAK 2 and BI-PAD belong to defendant, Elias R. Zenkich, owner of codefendant Zenex Corporation. Heath seeks reversal of the judgment as well as a declaration that he is the inventor of the BI-PAK 2 and BI-PAD devices and entitled to the respective patent applications which had been filed by defendants and any patents issued or issuing from those applications. The sole issue on appeal is whether the trial court properly determined that Zenkich, not Heath, first conceived the inventions and, thus, is entitled to the benefits of inventorship. For the following reasons, we affirm the judgment of the trial court.

The record indicates that in the early 1970's, Zenco Engineering Corporation, a predecessor corporation to Zenex, hired Heath as a machinist. During Heath's affiliation with Zenex, the BI-PAK 2 and the BI-PAD were developed. The BI-PAK 2 is a device which permits defibrillation of a patient during physiological monitoring by using one pair of preapplied and preconnected electrodes for both defibrillation and physiological monitoring. The BI-PAD is a grounding pad for use during electrosurgical procedures. Both the BI-PAK 2 and the BI-PAD were subsequently manufactured and sold by Zenex. The patent application for the BI-PAD was filed on December 20, 1976, and the application for the BI-PAK 2 was filed on February 27, 1978. Both applications named Zenkich as inventor. At Zenkich's request, Heath assisted Zenkich's patent attorney in the preparation of both patent applications. Heath claimed that he did not file patent applications in his own name because he believed that the applications had been filed in Zenkich's name, the BI-PAK 2 and BI-PAD had been on sale for more than one year and pursuant to 35 U.S.C. section 102(b) (1976), he was barred from filing applications for letters patent in his own name. When Heath asked Zenkich to file an affidavit with the Patent and Trademark Office to correct the name of the inventor on the applications or to at least name him as a joint inventor, Zenkich refused, stating he believed himself to be the sole inventor of the two devices.

As a result, Heath filed his complaint in the circuit court of Cook County seeking equitable and declaratory relief. Count I sought an order compelling Zenkich "to file appropriate documentation in the United States Patent and Trademark Office setting forth the facts regarding inventorship, as found by [the circuit court]" for the BI-PAD device. Count II sought a similar order for the BI-PAK 2 device. Count III sought a declaratory judgment that Heath was either the sole inventor or a joint inventor of the two devices and also sought a

declaration as to Heath's ownership rights in the two patent applications, the inventions and the patents which may issue. Count IV sought an order compelling Zenex and Zenkich to execute documentation necessary to vest in Heath the ownership rights to the inventions, patent applications and the patents which may issue. Zenex and Zenkich moved to dismiss the complaint for failure to state a claim upon which relief may be granted and for lack of subject matter jurisdiction. The circuit court dismissed counts I and II for failure to state a claim upon which relief can be granted, dismissed count III for both failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction, and dismissed count IV for lack of subject matter jurisdiction. Heath appealed, and in *Heath v. Zenkich* (1982), 107 Ill. App. 3d 207, 437 N.E.2d 675, this court reversed the trial court and remanded the cause for further proceedings on the grounds that the trial court had improperly declined to exercise jurisdiction over counts III and IV, count III was a proper subject for declaratory judgment, and counts I and II sought remedies for the alleged violation of Heath's ownership rights in the two inventions.

When trial commenced in October 1987, Scott Saulters, former Zenex employee who worked directly under Heath's direction, testified that the BI-PAK 2 was developed by Heath from an idea Saulters had suggested to Heath after watching a television program entitled "Space 1999." From the television program, Saulters got the idea that the same electrodes could be used to both monitor and to defibrillate the heart. Saulters identified several drawings and sketches of the BI-PAK 2, including one that was dated June 22, 1976, and initialled by Heath, as well as a more detailed drawing of the BI-PAK 2, signed by Heath and witnessed by Saulters at Heath's request on October 8, 1976. However, Saulters admitted that he had never seen Heath actually draw any of the sketches and drawings and had not been privy to all of the conversations between Heath and Zenkich. In addition, Saulters identified a prototype of the BI-PAK 2 which had allegedly been prepared by Heath in December 1976. Saulters admitted that all of the work on the prototype had not been done in his presence.

Next, the evidence deposition of Dr. Alon Winnie, professor and chairman of the department of anesthesia at the University of Illinois Medical Center, was introduced into evidence. Dr. Winnie stated that in late 1976, on his first visit to Zenex, Heath had shown him the BI-PAK 2 on which he was working. According to Dr. Winnie, Heath had made the prototype and Zenkich had referred to the device as Heath's "toy."

Zenkich then testified as an adverse witness and stated that the first BI-PAK 2 was constructed in the early 1970's and the BI-PAD was first built in the "early 70's, 3, 4, 5."

Next, Heath testified that he had invented both the BI-PAK 2 and BI-PAD and proceeded to describe in detail the functions of each. Heath then identified and discussed several exhibits which were introduced into evidence: (1) sales handout, entitled "Electrosurgically Speaking," dated December 8, 1975, and describing the TERRAPAD, the former name for the BI-PAD, "by Roger Lee Heath"; (2) sales handout, entitled "Electrosurgically Speaking," dated December 8, 1975, and also describing the TERRAPAD "by Roger Lee Heath"; (3) drawing of a defibrillator with a cord running from the defibrillator to electrodes which attach to the patient, dated June 22, 1976, and initialled by Heath; (4) drawing of the BI-PAK 2, witnessed by Saulters on October 8, 1976, and signed by Heath; (5) prototype of the BI-PAK 2 built by Heath; (6) sales handout, entitled "Layout BI-PAK 2," dated February 17, 1977, and stating "by Roger Lee Heath"; and (7) preliminary layout of the BI-PAK 2, dated February 17, 1977, stating "by Roger Lee Heath."

On cross-examination, Heath stated that Zenkich had prepared some of the drawings of parts for the BI-PAD which were used by outside sources to produce the parts. The parts were then shipped back to Zenex, where the products were assembled. Heath claimed that Zenkich had nothing to do with the assembly of the BI-PAK 2 prototype. In fact, Heath stated that he did not even believe Zenkich was aware that he was building a prototype. Heath further stated that he had told Saulters and others that he had invented the BI-PAK 2 and BI-PAD, but neglected to tell the patent attorney when he worked with him on the patent applications.

Heath then rested his case and Zenkich testified on his own behalf, stating that he is the sole owner of Zenex, which manufactures medical products in the patient monitoring field which are sold to hospitals, doctors, clinics and paramedics. Zenex was formerly known as Zenco Engineering Co. and Medizenco. Zenkich indicated that there were no formal procedures regarding the development of new products at Zenex "because I didn't deem it necessary to have it since it's a small company, my own company, I thought I could do as I see fit to my company and my employees and everybody else to do what's necessary to be done." Moreover, there were no locked cabinets. All sketches and drawings were accessible to anyone.

Regarding the BI-PAD, Zenkich stated that he had invented it. He made the sketches and instructed his employees, including Heath, as

to what to do. Zenkich explained that the BI-PAD was the result of many years of visiting hospitals and discussing monitoring needs with doctors. He further claimed that he "did really everything from A to Z, except some things which the service department made switching in our production. They cut with scissors, cut the shape or something. I would make sketches and ask them to do this and do that, and that's how it happens." When asked if he had kept any sketches, Zenkich stated that he had kept only "menial sketches" because "it's a very simple product, nothing electronic about it. There's no T.V., tubes or chips or anything. It's a plain switch, microswitch with two wires and two plates. It's nothing complex." Zenkich further stated that, "Everything was prepared and done at my direction in my own business." Zenkich denied that Heath had suggested the BI-PAD.

Regarding the BI-PAK 2, Zenkich testified that it was born out of necessity and invented under his direction. He further stated, "That was a weekly discussion, so I don't know when was really whole thing, how was the BI-PAK physically developed, who put it together. Many people in my employment put it together. One person made box and switches, the other person did wiring. I don't know[,] Scott [Saulters] or Roger [Heath] did wiring. I personally did some wiring myself." Zenkich further claimed that he had made all the sketches and drawings, but did not know if any of them had been kept. With respect to the advertising sales sheets, Zenkich testified that they were written by Heath at his request.

On cross-examination, Zenkich stated that Heath "was employed to do anything which I seen [sic] fit [for him] to do," as were all of his employees. Zenkich further claimed that the BI-PAD was "in his mind" as early as 1974, 1975 or 1976. However, he had no physical evidence to corroborate his testimony because the files had been removed from his premises. In addition, Zenkich could not remember to whom he first disclosed either the BI-PAK 2 or the BI-PAD.

The parties concur that the sole issue before this court is whether the trial court erred in its determination that Zenkich conceived the inventions and that the benefits of the inventorship of the BI-PAK 2 and the BI-PAD belong to Zenkich. Although Heath's claims for declaratory and equitable relief are controlled by Illinois law (Heath v. Zenkich (1982), 107 Ill. App. 3d 207, 437 N.E.2d 675), his theory of the case, i.e., conception of inventions, necessitates that Federal patent law be incorporated to a limited extent, particularly with respect to the burden of proof. (See GAF Corp. v. Amchem Products, Inc. (E.D. Pa. 1981), 514 F. Supp. 943.) The underlying factual allegation to Heath's complaint is that he invented the BI-PAK 2 and the BI-

PAD and any claims of inventorship by Zenkich are invalid. Because Zenkich's patent applications for the BI-PAK 2 and the BI-PAD were filed first, Zenkich would be considered the "senior party" in a Federal patent action, and Heath, as the "junior party," would have the burden of proving priority of conception by a preponderance of the evidence. (See *Rex Chainbelt, Inc. v. Borg-Warner Corp.* (7th Cir. 1973), 477 F.2d 481.) For the reasons stated, we find that preponderance of the evidence is the burden of proof applicable to the present case.

■ Prior to addressing the issue of priority of conception, a preliminary question is whether Heath's skill inures to the benefit of Zenex, as Heath's employer. If it does, then the issue of priority of conception is irrelevant. As a general rule, an employer who hires or engages someone for consideration to devote his time to developing a product becomes the owner of that property which is developed and of any invention incident to it. (*Lion Manufacturing Corp. v. Chicago Flexible Shaft Co.* (7th Cir. 1939), 106 F.2d 930.) However, to claim the benefit of an employee's skill so as to obtain a patent in the employer's name, the employer must have had more in mind than a desired result. The employer must show that he had an idea of the means to accomplish the particular result and that he communicated that means in such detail to the employee that the employee was able to develop the idea into a practical form. *Barnet v. Wied* (C.C.P.A. 1952), 195 F.2d 311.

■ Heath contends that he was not an employee of Zenex; rather, he was an independent contractor who worked as director of the Zenex biomedical engineering department. In support of his argument, Heath testified that his department was physically located in a separate area within the main building and that he kept a detailed expense report for his department which indicated that he had paid Saulters' salary as well as other department expenses out of his own profits.

In contradiction to Heath's position, Zenkich testified that Heath was an employee on the payroll "from the day he begun [*sic*] to the day he left." Zenkich introduced evidence to show that deductions had been made for Federal and State withholding taxes and for social security. In addition to his regular salary, Heath also earned commissions and participated in the profits of the company. Zenkich further explained that everything was done on an expense basis at that time, which explains Heath's expense reports for his department. The expense reports itemized all income and expenses to the department, and any profit was split 50/50 between Zenex and Heath. This 50/50

split constituted Heath's profit sharing. In our view, the evidence supports the conclusion that Heath was an employee of Zenex, not an independent contractor.

Having determined that Heath was an employee of Zenex, the next issue to be decided is whether Heath was hired "to devote his time to developing a product" so that, pursuant to the general rule enunciated in *Lion Manufacturing Co.*, Zenex becomes "the owner of that product or any invention incident to it." Although it is undisputed that Heath was not hired by Zenex specifically to invent or to provide design engineering services, neither was he hired by Zenex to act as a service representative, sales person or advertising copywriter. Yet, Heath worked in all of these capacities, Zenex is a small corporation, which at the time the BI-PAK 2 and BI-PAD were invented, employed approximately 11 people, including clerical and accounting. As indicated by the testimony of Heath, Saulters and Zenkich, it was standard practice for there to be an overlap of job functions at Zenex. In that regard, Zenkich testified that his employees were hired to do anything he saw fit for them to do and that everything was prepared and done at his direction. Based on the fact that product development was one of several areas in which Heath worked at Zenex, we find that the general rule enunciated in *Lion Manufacturing Co.* is applicable to the circumstances of the case at bar, provided that Zenkich has shown that he knew how to produce the product of his conception and had communicated that knowledge to Heath.

▪ Regarding this prerequisite to application of the general rule, Heath contends that the ideas for the BI-PAK 2 and the BI-PAD and the development of the devices were his alone. Zenkich disputes this contention and claims that all of the ideas were his and that he had discussed the development of the devices with Heath. In reviewing this conflicting testimony, we are cognizant of the rule that in a bench trial, it is within the province of the trial court to determine the credibility and weight of the testimony in resolving any inconsistencies or conflicts and to render its decision accordingly. (*Silas v. Robinson* (1985), 131 Ill. App. 3d 1058, 477 N.E.2d 4.) Further, the appellate court cannot substitute its opinion for that of the trier of fact unless the holding is contrary to the manifest weight of the evidence. *Scheduling Corp. of America v. Massello* (1987), 151 Ill. App. 3d 565, 503 N.E.2d 806.

At trial, Heath introduced numerous exhibits which consisted of drawings and sketches of the BI-PAK 2 and the BI-PAD, some of which were dated and initialled. Saulters testified as to having seen some of these sketches and, at Heath's request, had even witnessed

one of them. In addition, Dr. Winnie stated in his evidence deposition that Heath had made the BI-PAK 2 prototype and that Zenkich had referred to the BI-PAK 2 as Heath's "toy." In our view, this evidence does not establish Heath's priority of conception of the BI-PAK 2 and the BI-PAD for several reasons. Although Saulters had seen the sketches and drawings introduced by Heath, he testified that he had not actually seen Heath draw any of them, including the one that he had witnessed. Further, Saulters admitted that he was not privy to all of the conversations between Zenkich and Heath. Thus, even if Saulters had seen Heath draw the sketches and assemble the prototype, he would have no personal knowledge as to whether Heath was acting under Zenkich's direction or on his own volition. With respect to Dr. Winnie's testimony, in our view it is evidence of nothing more than that Heath worked on the BI-PAK 2 prototype. It is not evidence that Heath had conceived the invention. In addition, regarding the patent applications for the BI-PAK 2 and the BI-PAD, Heath testified that he assumed the application would name him as inventor, thus he never told the patent attorney that they were his inventions. We find this assumption inconsistent with Heath's alleged earlier efforts to have sketches initialled, dated and witnessed. If, in late 1976, Heath had believed it was necessary to protect the originality of his inventions from Zenkich, it is incredible that he would simply assume he would be named as inventor on the patent applications for these inventions which were later prepared by an attorney hired by Zenkich.

Heath places great emphasis on the fact that Zenkich did not present any corroborating evidence at trial to support his claim of priority of conception. In light of the fact that Heath had the burden of proving his claim by a preponderance of the evidence (*Rex Chainbelt, Inc. v. Borg-Warner Corp.* (7th Cir. 1973), 477 F.2d 481), and the evidence he introduced was not persuasive of his own claim, we do not find Zenkich's lack of corroborating evidence to be grounds for reversal. Without corroborating evidence from either party, the determining factor becomes the credibility of the witnesses, which, as stated, is within the province of the trier of fact. At trial, Zenkich testified that he has been the sole owner of Zenex and its predecessor companies for 25 years. Originally, Zenkich invented, manufactured and sold his products himself. As the company grew, he hired others to manufacture and sell his inventions. As stated, Zenex was a small company where all plans, drawings and sketches of new products were accessible to all of the employees. Zenkich stated that it was not the company policy to maintain documents indicating when an idea had been conceived because all of the original ideas were his. He would then

prepare drawings and sketches from which his employees would produce the product. Regarding the BI-PAK 2 prototype allegedly built by Heath, Zenkich stated that several individuals had made models of the BI-PAK 2 out of different materials. Heath's model was just one of them.

Based upon our review of the record, we find that the circuit court's determination was not against the manifest weight of the evidence and that it properly determined that the benefits of the inventorship of the BI-PAK 2 and the BI-PAD belong to Zenkich. Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.